UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COURTNEY WEBSTER, | ) | |
| BRIAN WEBSTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02677-JMS-DML |
| | ) | |
| CENTER FOR DIAGNOSTIC IMAGING, INC. | ) | |
|   d/b/a CDI | ) | |
|   d/b/a CDI INDIANAPOLIS, | ) | |
| CDI INDIANA, LLC | ) | |
|   d/b/a CDI | ) | |
|   d/b/a CDI INDIANAPOLIS, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

Plaintiffs Courtney and Brian Webster filed this lawsuit against the Center for Diagnostic Imaging, Inc. and CDI Indiana, LLC (collectively, "<u>Defendants</u>"), alleging that Ms. Webster's recurrent rectal cancer went undiagnosed for over a year and a half after her CT scan was misread. In advance of the June 11, 2018 trial in this matter, the Websters filed three Motions to Exclude Expert Testimony. Each of these Motions highlights the importance of cross-examination, and in considering each Motion, the Court is guided by Justice Stevens' words in *United States v. Salerno*:

> Even if one does not completely agree with [John Henry] Wigmore's assertion that cross-examination is 'beyond any doubt the greatest legal engine ever invented for the discovery of truth,' one must admit that in the Anglo-American legal system cross-examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate.

505 U.S. 317, 328 (1992) (Stevens J., dissenting).

Presently pending before the Court are: (1) the Websters' Motion to Exclude the Testimony of Thomas R. Ireland, Ph.D., [Filing No. 80]; (2) the Websters' Motion to Exclude the Testimony

of Anthony J. Senagore, M.D., [Filing No. 82]; and (3) the Websters' Motion to Exclude the Testimony of Neerav Mehta, M.D., [Filing No. 84].

# I.
## APPLICABLE LAW

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A trial judge:

> must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry . . . .

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). Notably, "[t]he principles set forth in *Daubert*, which addressed scientific testimony, apply equally to non-scientific fields." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999)).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill.*

*Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779.

## II.
### BACKGROUND[1]

In 2009, Courtney Webster underwent treatment for rectal cancer. [Filing No. 41-1; Filing No. 41-2.] By 2010, her medical exams showed no signs of cancer, but she underwent follow-up colonoscopies periodically over the next three years, none of which detected cancer. [Filing No. 41-3.]

In October 2014, Ms. Webster underwent a colonoscopy, which revealed a "large mass" and a "flat polyp." [Filing No. 41-5 at 1.] Based on these results, the doctor who performed the colonoscopy recommended that Ms. Webster schedule a CT scan "at the next available appointment." [Filing No. 41-5 at 2.] On November 17, 2014, Ms. Webster underwent a CT scan, (the "2014 scan"), the results of which were signed by Dr. Michael Walker the following day. [Filing No. 41-9; Filing No. 41-11 at 2.] Dr. Walker made the following conclusions:

1. Abnormal extraluminal soft tissue structure along the posteromedial aspect of the cecum. This was not present in 2009, I do not have a more recent exam. This is of unclear etiology, but may represent an implant along the serosal margin. No adjacent focus of bowel wall thickening or infiltration is identified.
2. No additional enlarged soft tissue structure or adenopathy in the peritoneum.
3. Stable nodule adjacent to the right adrenal gland. This may be an exophytic nodule arising from the lateral limb. Given its stability, this is highly likely benign finding.
4. Tiny low-density lesion lower pole left kidney consistent with a small simple cyst. 3 x 2 mm calculus midportion right kidney.
5. The uterus is septate in morphology.

---

[1] The background set forth herein is taken largely from the Court's Order on the parties' Motions for Summary Judgment. [*See* Filing No. 50 at 4-8.]

3

[Filing No. 41-11 at 2.]  Dr. Walker's conclusions did not note a rectal tumor on the images of the 2014 scan.  [Filing No. 41-8 at 5; Filing No. 41-11 at 2.]

By March, 2016, Ms. Webster again complained of constipation.  [Filing No. 41-14.]  A scope performed on April 27, 2016 revealed a tumor, [Filing No. 41-16], and a CT scan the following week revealed a tumor that had "increased in size since November 17, 2014."  [Filing No. 41-17 at 2.]

On October 10, 2016, Courtney and Brian Webster filed suit, arguing that "as a direct and proximate result" of Defendants' "substandard care, Courtney Webster's rectal cancer grew and spread, significantly reducing her chances of surviving the disease, significantly altering her treatment options, and causing her severe pain, suffering and emotional distress," and depriving Brian Webster "of his wife's services, love, and companionship."  [Filing No. 1 at 2.]

**III.**
**DISCUSSION**

On April 12, 2018, the Websters filed three Motions to Exclude Expert Testimony that Defendants intend to introduce at the June 11, 2018 trial in this matter.  [Filing No. 80; Filing No. 82; Filing No. 84].  Below, the Court provides a brief summary of each expert's report and of the parties' arguments related to the report and anticipated testimony, before discussing the admissibility of the report and associated evidence.

**A. Thomas R. Ireland, Ph.D.**

*1. Summary of Report*

Thomas R. Ireland, one of Defendants' expert witnesses, is an economist who issued a report on December 19, 2017 concerning damages relating to Ms. Webster's lost earning capacity. [Filing No. 81-4 at 1.]  In preparing his report, Mr. Ireland reviewed the Websters' tax returns from 2008 through 2015.  [Filing No. 81-4 at 1.]

4

Based upon his review, Mr. Ireland observed that much of Ms. Webster's career was "as a real estate agent, though it appears that all of her earnings in the period before her recurrence of rectal cancer came in the form of compensation from her husband's business." [Filing No. 81-4 at 1.] In calculating Ms. Webster's earnings, Mr. Ireland reported that he added "the sum of W-2 income in her name" with business income from line 12. [Filing No. 81-4 at 1.] Mr. Ireland observed that although Ms. Webster generated "substantial annual gross revenues from real estate" after 2010, "her costs in that line of work completely offset those revenues." [Filing No. 81-4 at 1-2.] Mr. Ireland summarized Ms. Webster's earnings from 2008 to 2015 as follows:

Table 1 – Recorded Earnings of Courtney Webster

| Year | Business Income | W-2 Income | Total Income |
|------|-----------------|------------|--------------|
| 2008 | $46,024 | $24,728 | $70,752 |
| 2009 | $73,617 | N.A. | $73,617 |
| 2010 | $0 | N.A. | $0 |
| 2011 | $0 | $43,846 | $43,846 |
| 2012 | $0 | $55,385 | $55,385 |
| 2013 | $0 | $55,385 | $55,385 |
| 2014 | $0 | $43,846 | $43,846 |
| 2015 | $0 | $43,846 | $43,846 |

[Filing No. 81-4 at 2.]

As a result of the foregoing data, Mr. Ireland opined that "based on assumptions made in this preliminary report" Ms. Webster's earning capacity loss has a present value of $306,958. [Filing No. 81-4 at 3.] As a final matter, Mr. Ireland noted that some of the assumptions he identified in issuing his report "may need to be changed in light of further discovery, but the general framework that will be used is the framework used in this report." [Filing No. 81-4 at 4.]

### 2. *The Websters' Motion to Exclude*

The Websters argue that Mr. Ireland's testimony should be excluded because: (1) his opinions lack basis in sufficient facts or data, (2) he failed to use reliable principles and methods, and (3) he failed to apply methods and principles reliably to the facts. [Filing No. 86 at 8-15.]

Specifically, the Websters assert that although Ms. Webster's reported earnings exceeding $100,000 almost every year between 2010 and 2017, as reflected on her Century 21 Form 1099s, Mr. Ireland "did not incorporate any of these amounts . . . into his report or supplemental report," incorrectly assumed that Ms. Webster's real estate earnings reported on the Century 21 1099s were gross rather than net earnings, and deducted expenses from the painting business Ms. Webster owns with her husband from her Century 21 earnings. [Filing No. 86 at 8.] As a result, Mr. Ireland calculated Ms. Websters' "net earnings as a real estate agent" to be "zero each year between 2008 and 2015." [Filing No. 86 at 8.] The Websters concede that the information Ms. Webster reported on her joint, personal tax returns "did, in fact, show that she had no taxable income from her real estate business," but the contend that "benefit of the tax-write offs" that the Websters received "should not be used against them at trial in an attempt to reduce Ms. Webster's future earning capacity." [Filing No. 86 at 9-10.] In addition, the Websters argue that Mr. Ireland falsely assumed that Mr. Webster was the sole owner of a painting business, when Ms. Webster actually owns a majority interest in the company. [Filing No. 86 at 10.] As a result, the Websters argue that when determining her future earning capacity, Mr. Ireland did not take Ms. Webster's ownership of the business into account, or how the earning capacity of the business will be negatively affected by ceasing to be a woman-owned business after her passing. [Filing No. 86 at 10-11.] The Websters further argue that Mr. Ireland's testimony should be blocked for the same reasons it was blocked in a recent case in Missouri – namely because his "approach to analyzing loss of financial support

in this case is not a reliable measure of damages and, therefore, not relevant." [Filing No. 86 at 12]

(quoting *Dejana v. Marine Tech., Inc.*, 2013 WL 6768407, at *10 (E.D. Mo. Dec. 20, 2013)).]

Lastly, the Websters contend that Mr. Ireland erroneously took tax consequences into account in

conducting his calculations. [Filing No. 86 at 14.]

      In response, Defendants contend that the Websters presented "a factually-incorrect

description of how Mr. Ireland used the information" that the Websters provided. [Filing No. 91

at 6.] Defendants argue that "in developing his opinions," Mr. Ireland "relied exclusively on what

the Websters themselves reported to the IRS" and "did not disregard any other evidence available

to him concerning income attributable to Mrs. Webster." [Filing No. 91 at 8.] In addition,

Defendants contend that whether Mr. Ireland was aware at the time of his initial report that Ms.

Webster was a co-owner of the painting company "is immaterial to the question of whether [she]

had income from her real estate business from 2010 to 2016." [Filing No. 91 at 9.] Similarly, with

regard to Mr. Ireland's methods, Defendants argue that the Websters "have failed to demonstrate"

how Mr. Ireland's reliance on what the Websters "reported to the IRS constitutes a failure to use

reliable principles and methods." [Filing No. 91 at 11.] Defendants further point out that *Dejana*

is distinguishable because in that case, Mr. Ireland was faulted for "basing a spouse's future lost

income opinion estimate exclusively on adjusted gross income figures from [joint] tax returns,

without separating between the spouses" whereas here, Mr. Ireland "endeavored to do precisely

the opposite" and based his opinions "on an analysis of the income specifically attributed to Mrs.

Webster." [Filing No. 91 at 10.] Lastly, Defendants contend that Mr. Ireland's opinions "do not

subtract [Ms.] Webster's past or future potential tax liability from her projected loss of future

income." [Filing No. 13-14.]

In their reply brief, the Websters counter that Mr. Ireland "conflated 'earning capacity' with 'taxable income'" in determining Ms. Webster's future earning capacity. [Filing No. 114 at 3.] The Websters reiterate that Ms. Webster's 1099 forms establish her net real estate earnings, regardless of tax deductions. [Filing No. 114 at 3.] The Websters state that "[t]ax returns did not tell the whole story in *Dejana*, and they do not here, either," [Filing No. 114 at 7], and argue that Mr. Ireland's "reliance on pre-tax deductions does not fit to the evidence expected to be presented at trial" and is therefore not relevant, [Filing No. 114 at 8]. In addition, the Websters contend that the prejudicial effect of allowing Mr. Ireland to testify about the tax liability "will confuse and distract the jury from the questions that it will be charged with deciding." [Filing No. 114 at 3.]

The Court notes at the outset that Defendants misstate the law when they argue that the Websters "have failed to demonstrate how Dr. Ireland's reliance on what the Plaintiffs reported to the IRS constitutes a failure to use reliable principles and methods." [Filing No. 91 at 11.] "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). In this case, the burden is on Defendants to demonstrate that Mr. Ireland's testimony is within the confines of *Daubert* and should be allowed in court.

Cases applying *Daubert* recognize a distinction between issues that are left to the trial court to decide, and those that are "left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his [or her] conclusions and the facts on which they are based." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589-90 (7th Cir. 2000)). As to the former, the trial court is "limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound;" as to the latter, the "question of whether the

expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury." *Id.*

In this regard, the Webster's Motion to Exclude the Testimony of Mr. Ireland involves issues that may be explored during cross-examination. The Court concludes that the general method of using tax returns to determine the value of Ms. Webster's lost wages is sound—indeed, the Court is hard-pressed to identify a better way make such calculations.[2] However, the issue of whether Mr. Ireland correctly computed calculations to arrive at his conclusions will be left to the jury after the Websters have been afforded the opportunity to cross-examine him at trial. Indeed, *Daubert* itself instructs that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. Accordingly, the Websters' Motion to Exclude Mr. Ireland's Testimony, [Filing No. 80], is **DENIED**.

**B. Anthony J. Senagore, MD**

*1. Summary of Report and Subsequent Deposition*

Anthony J. Senagore, M.D., one of Defendants' expert witnesses, is a board certified General and Colorectal Surgeon. [Filing No. 83-1 at 1.] In preparing his report, Dr. Senagore reviewed the Websters' Complaint, Ms. Webster's CT Scans from 2009, 2014, and 2016, and several medical records. [Filing No. 83-1 at 1.]

---

[2] In making this determination, the Court notes that the main factor underlying the Eastern District of Missouri's decision in *Dejana v. Marine Tech., Inc.*, 2013 WL 6768407, at *10 – the family income methodology, in which Mr. Ireland testified as to loss based on the income of the family unit as a whole and not solely on the decedent's income – is not present in this case and is, therefore, distinguishable on that ground. Moreover, *Dejana* cited to numerous cases applying Missouri law, *id.* at *10, which is not binding on this Court or relevant to this case.

On December 7, 2017, Dr. Senagore issued a report containing several findings. [Filing No 83-1.] Just over two months later, on February 13, 2018, Dr. Senagore was deposed by the Websters' counsel and gave testimony that covered topics similar to those discussed in his report. [Filing No. 83-2.] At his deposition, Dr. Senagore testified that his report "accurately and completely summarizes" the opinions that he intends to testify to in this case. [Filing No. 83-2 at 8.] Dr. Senagore's findings in the report and his deposition are as follows:

| Dr. Senagore's Report | Dr. Senagore's Deposition Testimony |
|---|---|
| "Based upon my education, training, and experience, I believe that [the] radiologist . . . met the standard of care in all respects related to the interpretation of the imaging study on November 17, [2014] that he performed and interpreted." [Filing No. 83-1 at 1.] | "Q Okay, so are you not qualified to opine as to whether a board certified radiologist has complied with the standard of care? A I don't think I – I think legally I can't assume their standard of care. I can assume the standard of care regarding therapy for a given pathology, in this case rectal cancer." [Filing No. 83-2 at 2.] |
| "The CT scan performed on Nov 17, 2014 . . . did not demonstrate a rectal lesion." [Filing No. 83-1 at 2.] | "Q Okay, and we've been over this a little bit, but I just want to make sure I'm clear, do you agree that the mass in the presacral space seen on the 11-17-14 CT scan is the same mass that was identified on the May 2016 CT scan performed at St. Vincent? A I think retrospectively you would say they're the same lesion, yes." [Filing No. 83-2 at 15.] . . . . "I could not appreciate a tumor on the 2014 film." [Filing No. 83-2 at 10.] . . . . "So the best that I could discern was some thickening of the rectal wall that would have been at that moment in time difficult to distinguish from post-surgical changes." [Filing No. 83-2 at 10.] |

. . . .

"Q . . . And I just want to be sure I understand your reading of the November 17, 2014 CT again. You're telling me that you saw no abnormalities in the presacral space and in the area where the tumor appeared on the May 4, 2016 CT scan that you believed to be clinically significant, is that correct?

A I think to be more precise, so I saw what I interpreted as thickening in the excision site but not enough for me personally to diagnose a recurrent cancer or a new cancer in that location."
[Filing No. 83-2 at 12.]

. . . .

"Q And I'm sorry if I'm repeating myself but I just want to make sure that I understand what you've told me. You're telling me that in your review of the November 17, 2014 CT you did see something in the presacral space but you did not believe that what you saw was enough to allow you to make a diagnosis of cancer?

A A rectal cancer, correct."
[Filing No. 83-2 at 13.]

. . . .

"Q . . . Okay, and when you say 'thickening' and I say 'mass,' explain to me why you are unwilling to say 'this is a mass' and use the term 'thickening.'

A Well, I guess between 'mass' and 'thickening' I'm not sure there's a huge distinction."
[Filing No. 83-2 at 13-14.]

. . . .

| | "Q . . . The rectal mass appears on all of these images, correct? |
| | |
| | A Correct." |
| | [Filing No. 83-2 at 14.] |
| "The ultimate recurrence which was identified in April, 2016 may actually have represented a new primary rectal cancer." [Filing No. 83-1 at 2.] | "Q Okay, and we've been over this a little bit, but I just want to make sure I'm clear, do you agree that the mass in the presacral space seen on the 11-17-14 CT scan is the same mass that was identified on the May 2016 CT scan performed at St. Vincent? |
| | |
| | A I think retrospectively you would say they're the same lesion, yes." [Filing No. 83-2 at 15.][3] |
| | |
| | . . . . |
| | |
| | "Q Okay, and you think it's medically likely, even though you're looking retrospectively, based upon all the evidence that you have you think it's likely that that was tumor in November of 2014, correct? |
| | |
| | A Yes." [Filing No. 83-2 at 16.] |
| | |
| | . . . . |
| | |
| | "Q Okay, but in any event, whatever it was, it was present in November of 2014, correct? |
| | |
| | A I think retrospectively, yes, we have to say that." [Filing No. 83-2 at 18.] |
| | |
| | . . . . |
| | |
| | "Q . . . My question was do you think she had microscopic lung disease in 2014? |
| | |
| | A Yes." [Filing No. 83-2 at 19.] |

---

[3] The Court includes this excerpt twice herein, as its content pertains to two separate assertions from Dr. Senagore's report.

| | . . . . |
| | |
| | "Q And whatever it was that was present in November of 2014 in your opinion it was likely incurable at that point? |
| | |
| | A I think it was a very aggressive molecular tumor at that time, yes. . . . Incurable, yes." [Filing No. 83-1 at 19.] |
| "A CT scan was performed on Nov 17, 2014 as part of this ongoing surveillance process and the only abnormality was an appendiceal mass." [Filing No. 83-1 at 1.] | "Well, you know, if I was going to be more precise on the document now, I would say that the obviously clinically actionable abnormality was the appendiceal mass . . . . If I was going to be more explicit, I would've said there is thickening in the mesorectum as well as the adrenal and the other findings . . . if I was going to be more complete. |
| | |
| | Q All right, because those are abnormalities, correct? |
| | |
| | A Fair enough." [Filing No. 83-2 at 15.] |

### 2. *The Websters' Motion to Exclude*

The Websters argue that Dr. Senagore's testimony should be excluded because he "intends to offer testimony that was not disclosed in his Rule 26 report, and in fact contradicts the opinions disclosed in his Rule 26 report." [Filing No. 87 at 1.] The Websters identify several areas in which they argue that Dr. Senagore's Rule 26 report and his testimony contradict one another, including: (1) whether he was qualified to opine on the standard of care; (2) whether the 2014 scan demonstrated a rectal lesion; (3) whether an appendiceal mass was the only abnormality that the 2014 scan showed; (4) whether the abnormality Dr. Senagore saw on the 2014 scan was the same cancer that was subsequently seen on Ms. Webster's May 2016 scan; and (5) whether the cancer present in 2014 had already spread microscopically to Ms. Webster's liver and lung at that time.

[Filing No. 87 at 2-4.]  The Websters argue that such contradictions violate Fed. R. Civ. P. 26(a)(2), which requires a complete statement of all opinions the retained expert will provide.  [Filing No. 87 at 4.]  The Websters claim that they were "never informed of Dr. Senagore's new, altered, or changed opinions at any time before his deposition was taken on February 13, 2018."  [Filing No. 87 at 6.]  The Websters also contend that a Rule 26 report cannot be supplemented with subsequent deposition testimony because doing so would undermine the purpose of the rule.  [Filing No. 87 at 8.]

In response, Defendants argue that Dr. Senagore's deposition testimony "was consistent with his report, and to the extent that Dr. Senagore provided further elaboration or details underlying his opinion, Dr. Senagore's testimony was well within the scope of the opinions expressed in his report."  [Filing No. 98 at 2.]  With regard to Dr. Senagore's opinions about the standard of care, Defendants argue that they "do not intend to attempt to offer into evidence at trial any opinion from Dr. Senagore regarding whether Dr. Walker complied with the standard of care."  [Filing No. 98 at 4.]  Concerning whether Dr. Senagore identified a lesion in the 2014 scan, Defendants state that "[i]n his deposition, Dr. Senagore acknowledged that he saw evidence of thickening in the area of the previous excision site" but that he "stood by his statement that at the time of his review of the November 17, 2014, CT scan, he did not identify a rectal lesion."  [Filing No. 98 at 10.]  Regarding whether the only abnormality was an appendiceal mass, Defendants contend that although Dr. Senagore "agreed that a more 'precise' identification of 'abnormalities' from his review of the CT scan would have included . . . the thickening that suggested post-surgical scarring, as well as other 'abnormalities,'" Dr. Senagore "did not retract his opinions, change his testimony . . . or offer affirmative opinions that were inconsistent with what was disclosed in his Rule 26(a)(2) report."  [Filing No. 98 at 12.]  On the issue of whether Dr. Senagore opined that the

2016 tumor was present in the 2014 scan, Defendants state that Dr. Senagore "was not saying in his report that the tumor identified in May of 2016 was not present in November of 2014" and there is "no genuine inconsistency" on this point in his deposition testimony. [Filing No. 98 at 14-15 (emphasis omitted).] Additionally, regarding whether Ms. Webster's cancer had spread in 2014, Defendants state that "Dr. Senagore's opinion that Mrs. Webster most likely had microscopic metastatic disease in 2014, although not explicitly stated in his report, can be readily inferred by his stated opinion that 'any tumor in 2014 – including, necessarily, any microscopic tumor – would have been just as poorly responsive to chemotherapy in 2014 as it was in 2016." [Filing No. 98 at 19.] Lastly, Defendants point out that despite inconsistencies between the Rule 26 report and the deposition testimony of one of the Websters' designated experts, Defendants "did not seek his exclusion as a witness at trial." [Filing No. 98 at 22.]

In their reply brief, the Websters reiterate that it is "readily apparent that the opinions disclosed in Dr. Senagore's Rule 26 report stand in direct opposition to the opinions that he testified to in his deposition." [Filing No. 116 at 3.] In addition, the Websters contend that Defendants' radiology expert, Dr. Manton, "put the kibosh to the opinions contained in Dr. Senagore's Rule 26 report the week before Dr. Senagore's deposition" after Dr. Manton testified that "there was a visible rectal mass in the presacral space on the 2014 CT scan that was apparent on multiple images," that "no one would say that the mass was not there to be seen," that "the mass was concerning for recurrent rectal cancer and that it was likely not a new primary rectal cancer," and that "there was no visible evidence of distant metastatic disease on the 2014 CT scan." [Filing No. 116 at 5.] The Websters emphasize that "there is nothing in Dr. Senagore's Rule 26 report that discloses his belief that by 2014, [Ms.] Webster already had metastatic rectal cancer, micrometastatic disease, or Stage IV disease." [Filing No. 116 at 6.] Lastly, the Websters argue

that "[t]he Seventh Circuit has determined that the punishment for failure to comply with the requirements of Rule 26(a)(2) is exclusion of the witness." [Filing No. 116 at 8.]

Pursuant to Federal Rule of Civil Procedure 26, the disclosure of expert testimony must be "accompanied by a written report" that must contain the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). If a party fails to provide information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The purpose of the report is to set forth the substance of the direct examination." Jenkins v. Bartlett, 487 F.3d 482, 487 (7th Cir. 2007) (citations omitted). Moreover, the Seventh Circuit has held that the threat and availability of exclusion "put[s] teeth into the rule." Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir. 1998). Rule 26 further provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial" but "the deposition may be conducted only after the report is provided." Fed. R. Civ. P. 26(b)(4)(A).

Here again, the Websters' Motion to Exclude implicates the concept of cross-examination, in this case occurring not at trial, but in a deposition where Dr. Senagore's testimony presented a mixed bag of statements that contradict his Rule 26 report and those that are consistent with his report. For example, Dr. Senagore stated in his report that the 2014 scan did not show a lesion –

16

an opinion he both contradicted and reiterated in his deposition testimony. *Compare* Filing No. 83-2 at 15 (in which Dr. Senagore characterized the 2014 scan as showing a "lesion") *with* Filing No. 83-2 at 10 (in which Dr. Senagore stated that the best he could discern in the 2014 scan "was some thickening of the rectal wall"). A side-by-side comparison between Dr. Senagore's report and testimony show significant differences. *See, e.g.*, Filing No. 83-1 at 1 (in which Dr. Senagore opined that the "only abnormality" in the 2014 scan was an "appendiceal mass"); Filing No. 83-2 at 15 (in which Dr. Senagore opined that, in addition to the appendiceal mass there was a "thickening in the mesorectum as well as the adrenal and the other findings"). As a result, the Court concludes that Dr. Senagore's report and deposition testimony are inconsistent on several points. This leaves the Court with the task of determining whether such inconsistencies are harmless or whether they merit the exclusion of Dr. Senagore's testimony.

On this point, an opinion from the Central District of Illinois is instructive. In *Hess v. Ameristep*, the court found that the opposing party needed an expert's opinion "in order to formulate a defense." 2008 WL 4936726, at *3 (C.D. Ill. Nov. 17, 2008). In that case, the court found that over the course of a four-hour deposition, opposing counsel "had both to discover [the expert's] opinions and to question him about those opinions." *Id*. at *3. The court found that this undercut the "primary goal of Rule 26(a)(2)" – "to relieve parties from the time and expense of discovering expert opinions." *Id*. at *3. As a result, the court found that the additional cost and expense imposed was not harmless. *Id*. at *3.

Similarly, the Websters' counsel conducted a deposition lasting over two hours in which counsel had to repeatedly ask Dr. Senagore for clarification after he partially or fully contradicted himself. Therefore, Dr. Senagore's report undercuts the very purpose behind Rule 26 reports – to set forth the substance of his direct examination and to relieve parties from the time and expense

of discovering expert opinions. Due to the contradictions between Dr. Senagore's Rule 26 report and his subsequent deposition testimony, the report failed to provide the Websters with the disclosure contemplated by Rule 26.

As the Seventh Circuit has held, "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado, 150 F.3d at 742* (citing *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). Other than their efforts to characterize his testimony as an elaboration of his deposition, Defendants do nothing to justify the obvious changes or demonstrate that they are harmless. Accordingly, the Court imposes the sanction of precluding the witnesses from testifying. *Id*. at 742 (noting that district court is "not required to fire a warning shot.") The Websters' Motion to Exclude the Testimony of Anthony J. Senagore, M.D., [Filing No. 82], is therefore **GRANTED**, and Defendants are precluded from presenting Dr. Senagore's testimony or report at trial.

### C. Neerav Mehta, M.D.

#### 1. *Summary of Report*

Dr. Neerav Mehta is one of Defendants' expert witnesses, is board-certified in radiology and neuroradiology and an Adjunct Assistant Professor of Radiology at the University of Pennsylvania, the Chief of Neuroradiology at Main Line Health, and the Chief Executive Officer of Cleareview, LLC. [Filing No. 85-2 at 1.]

In his report, Dr. Mehta describes his methodology of using a "blind review" in order to determine whether the standard of care was met by the reviewing radiologist in a case. [Filing No. 85-2 2.] Dr. Mehta describes expert witness bias in his report, and states that his company's blind panel review eliminates bias by providing the expert witness "data to determine whether . . . [the] standard of care was met." [Filing No. 85-2 at 3.] Dr. Mehta describes the process as follows:

> Similarly, Cleareview's Blind Panel Review takes a malpractice case and slips it into the workflow of board certified radiologists. This is typically performed with at least 10 radiologists. None of the radiologists are aware that the case is a malpractice case, thereby eliminating framing and affiliation bias. To further scientific methodology, this is a double blind evaluation where Cleareview is also unaware of the identities of the board certified radiologists. The results are recorded, and are then used as data to help base the expert witness's opinion as to whether or not standard of care was met. While the expert witness's opinion when reviewing the case themselves will be colored by framing and affiliation bias, they will also have access to this data from a study where these biases are eliminated, thereby strengthening the credibility of their opinion.

[Filing No. 85-2 at 3.]

In Ms. Webster's case, Dr. Mehta reported that a blind review of Ms. Webster's 2014 scan without clinical history or prior examinations resulted in zero out of ten radiologists finding peri-rectal soft tissue. [Filing No. 85-2 at 3.] A subsequent blind review, this time with the aid of Ms. Webster's clinical history and prior examinations, resulted in four out of twelve radiologists detecting the peri-rectal soft tissue. Because a majority of radiologists did not find peri-rectal soft tissue in the 2014 scan, Dr. Mehta concludes that "the radiologist did NOT fall below the standard of care." [Filing No. 85-2 at 4.]

### 2. The Websters' Motion to Exclude

In their Motion to Exclude, the Websters argue that Dr. Mehta's testimony should be excluded because it is "classic hearsay." [Filing No. 88 at 5-6.] Specifically, they argue that Defendants are "offering this testimony for the truth of what is asserted," and is therefore hearsay. [Filing No. 88 at 6.] The Websters further contend that the statements made by anonymous panel members do not fall within any exception to the hearsay rule because: (1) the statements were not made for purposes of medical diagnosis or treatment such that the Rule 803(4) exception applies; (2) the statements do not constitute records of a regularly conducted activity under Rule 803(6) because Dr. Mehta refuses to reveal the identity of the practice that supplied the doctors for the panel reviews; and (3) Dr. Mehta is not rendering an opinion such that Rule 703 would allow him

to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." [Filing No. 88 at 6-9.] In addition, the Websters argue that any testimony regarding the first blind panel is irrelevant because they "were not given the patient's history of rectal cancer, . . . provided with the indication for the exam, . . . [or] provided with the CT scans," as was the radiologist who originally reviewed Ms. Webster's 2014 scan. [Filing No. 88 at 9-10.] The Websters further argue that Dr. Mehta's testimony does not pass muster under *Daubert* because there is "no scientific support for the notion that standard of care is established by the findings of a majority . . . of the anonymous physicians in [a] 12-physician blind panel review," and "there is no legal support either." [Filing No. 88 at 11.] The Websters assert that the "possibility that the seven radiologists who missed the recurrent cancer in the blind panel review were acting below the standard of care highlights the unreliability" of Dr. Mehta's method. [Filing No. 88 at 12.] Moreover, the Websters argue that the blind panel deprives the jury of knowing how much time the "anonymous physicians on the panel" spent reviewing the images; how many scans they had read that day; how many hours they had been working; and numerous other details about radiologists' respective reviews of the 2014 scan. [Filing No. 88 at 15-16.] Lastly, the Websters argue that Dr. Mehta's testimony should be excluded under Rule 403 because "[a]ny arguable probative value of Dr. Mehta's testimony is far outweighed by its potential to unfairly prejudice the Websters, confuse the issues, and mislead the jury." [Filing No. 88 at 18-19.]

In their response brief, Defendants contend that bias in retrospective reviews of radiology studies is "a well-known phenomenon" and summarize several scholarly articles concerning blind studies. [Filing No. 93 at 3-7.] In addition, Defendants argue that Dr. Mehta's reviews meet the relevance and reliability standards under *Daubert*. [Filing No. 93 at 8.] With regard to hearsay, Defendants contend that they "will offer the blind panel study results to demonstrate simply that

they reflect the fact of each blind panel physician's interpretation, not the truth of any particular interpretation." [Filing No. 93 at 10 (emphasis omitted).]

In their reply brief, the Websters reiterate their argument that Dr. Mehta's proposed testimony is hearsay and that the blind panels "are not out-of-court statements being offered to demonstrate the 'fact' of the panel member's review," but are "being offered to prove the truth of what the anonymous panel members say they saw" in their review of the 2014 scan. [Filing No. 115 at 3.] In addition, the Websters contend that "Defendants make no effort to justify the unfounded assumption at the heart of Dr. Mehta's testimony" that all of the physicians on the blind panel were, themselves, exercising reasonable care. [Filing No. 115 at 4-5.] The Websters argue that, to the contrary, "[t]here simply is no connection between majority behavior and reasonable care." [Filing No. 15 at 7.]

"Whether a statement is hearsay and, in turn, inadmissible, will most often hinge on the purpose for which it is offered." *United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) (quotation omitted). If the statement is offered "not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the hearsay rule does not apply." *Id.* This is precisely the argument that Defendants proffer in this case. However, this argument is a non-starter. If Defendants were to introduce Dr. Mehta's panel results without reference to the truth of the matter asserted, then the evidence allowed in would be that a blind panel of radiologists rendered an opinion on the 2014 scan. Such evidence would not include the results of the blind panel review. Despite Defendants' claims, Dr. Mehta's testimony on the results of the blind panels is clearly being offered to prove the truth of the matter asserted by the results – namely whether the 2014 scan showed the return of Ms. Webster's cancer and, relatedly, whether a breach of the standard of care occurred in this case. The "ultimate question" is whether Defendants are offering

Dr. Mehta's testimony concerning the blind panels "for the purpose of establishing the truth of its contents," and the Court answers that question in the affirmative. *Jones v. Basinger*, 635 F.3d 1030, 1042 (7th Cir. 2011). As such, this statement is hearsay.

Defendants do not argue that any other exception to the hearsay rule applies and have therefore failed to meet their burden of showing that the testimony is nonetheless admissible. Accordingly, Dr. Mehta's testimony constitutes inadmissible hearsay.

The Court's analysis may stop here; however the Court will briefly address two additional deficiencies regarding Dr. Mehta's testimony. The first is that Defendants have failed to identify a single case in which Dr. Mehta's method has been used by a court. This makes it highly unlikely that Dr. Mehta's methodology suffices under Rule 702, even if it were not hearsay. Put simply, Defendants have not come close to meeting their burden of demonstrating that the Dr. Mehta's testimony would satisfy the *Daubert* standard. *Lewis*, 561 F.3d at 705 (providing that the proponent of the expert bears the burden of showing that the *Daubert* standard is satisfied).

The second deficiency in Dr. Mehta's testimony involves a recurring issue in the Websters' Motions to Exclude – cross-examination. As the Websters' point out in their brief, Dr. Mehta's testimony regarding the blind panel utterly undermines the importance of cross-examination by failing to allow opposing counsel to cross-examine the twelve physicians whose opinions comprise the blind panel results. In other words, the blind panel creates an inability to cross-examine the individuals upon whom Defendants would have the jury rely in determining whether the standard of care was met. This would eliminate the primary means of undermining the credibility of a witness whose testimony is false or inaccurate and therefore improperly undercuts the right of cross-examination.

On multiple grounds then, the Court excludes Dr. Mehta's report. Dr. Mehta's testimony is inadmissible hearsay, is not based on demonstrably reliable scientific principles, and denies the Websters their right of cross-examination . As such, the Websters' Motion to Exclude the Testimony of Expert Dr. Neerav Mehta, [Filing No. 84], is **GRANTED**, and Dr. Mehta may not testify at trial, nor may his report be presented.

## IV.
### CONCLUSION

For the foregoing reasons, the Court:

- **DENIES** the Websters' Motion to Exclude the Testimony Thomas Ireland, Ph.D., [80];

- **GRANTS** the Websters' Motion to Exclude the Testimony of Anthony J. Senagore, M.D., [82];

- **GRANTS** the Websters' Motion to Exclude the Testimony of Neerav Mehta, M.D., [84].

Date: 5/9/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**